[Civ. No. 8526. Third Dist. Mar. 2, 1955.]

GEORGE E. WILLIAMS, JR., et al., Respondents, v. CHRIS LARAS et al., Defendants and Appellants; STATE OF CALIFORNIA, Intervener and Appellant.

Coyle E. Bybee, George P. Kading and Landis & Brody for Defendants and Appellants.

Edmund G. Brown, Attorney General, and Ralph W. Scott, Deputy Attorney General, for Intervener and Appellant.

Hardin Barry and Anderson & Pancera for Respondents.

VAN DYKE, P. J.—This is an appeal from a judgment decreeing that the individual respondents and the intervening State of California are entitled to the use of all of the waters stored annually in the Tule Lake and Bayley reservoirs and that appellants have no right thereto and no right to use any part thereof on a parcel of land owned by appellant Laras and hereinafter referred to as "Section 16." The intervening State of California has also appealed on the ground that the judgment fails to declare the respective amounts of said waters to which it and the respondents are entitled.

The Tule Lake and Bayley reservoirs, together with a system of canals and ditches, constitute what is commonly known as the Madeline Water System, which the intervening state and the respondents now own as tenants in common and which, since about 1907, has been used to supply waters for the irrigation of certain real property in Lassen County. The land so serviced, now owned by the respondents and the state, does not include the above-mentioned "Section 16." Laras, as the owner of that land, and the other appellants, who were his tenants before the action was brought, claim they likewise had and have a right to receive a proportionate share of the waters so stored annually in Tule Lake reservoir, and claim that this right exists by virtue of a contract executed on

July 6, 1912, by the company which then owned said system, contracting with Laras' predecessors in interest in said section 16. By that agreement the water company covenanted with the then owner of said section 16 to furnish so much water as should be required to irrigate 600 acres of said section, but not exceeding one acre foot for each of said 600 acres. Provision was therein made for the apportionment of the total supply with the other landowners who had similar contracts, whenever there was insufficient water for all in any season. The contract purported to grant and sell "the right to the flow and use" of the amount of water agreed to be furnishd, and provided that: ". . . the said right to the flow and use of such water shall be and remain, forever, a perpetual servitude upon the reservoirs, ditches, canals and other aqueducts and the waters and water rights constituting the said water supply system, and shall be and remain attached to the Consumer's aforesaid tract of land [Section 16] as a perpetual easement appurtenant thereto."

The consideration for "the grant . . . of said right and easement to the flow and use of water" and for "the water" and for "the water to be furnished" was recited to be $21,000 to be paid upon the execution of the agreement, and $600 a year for 10 years thereafter, commencing on April 1, 1912. Upon default in any payment the company had the option to cease delivery of water until payment of all amounts due, together with interest thereon. The contract further provided that the benefit of all the covenants of the water company "shall run with and be transferable with" said section 16. After the execution of this contract the water company acquired title to said section 16 and its appurtenances. But merger was prevented by the fact that it took title to said section subject to an existing mortgage thereof. This mortgage was subsequently foreclosed and on August 3, 1915, there was executed a commissioner's deed of said section 16 and the "water right" attached thereto. This deed, through which appellant Laras deraigns title, recited that the referred to water right had been granted in consideration of $21,000 paid to the water company under the contract of July 6, 1912. There was no evidence that appellant Laras' predecessors in interest made any of the 10 annual $600 payments called for under the contract and it stands without dispute that no water has ever been delivered to or used upon said section 16, nor has any demand been made therefor from 1915 until

1951, when Laras demanded of the respondents and of the intervening state that there be delivered to said section for his use thereon the stipulated 600 acre feet for use in that year. In January of 1942 said section 16 had been for some time owned by Stanford University. On January 15, 1942, Laras and the university entered into a written agreement whereunder Laras agreed to purchase said section 16 for the sum of $2,500, payable in installments, and in due course he paid the purchase price and received a deed. Since said January 15, 1942, therefore, he has been either the equitable or the legal owner of said section. At approximately the same time Laras purchased other real property and also purchased the irrigation system, including the Tule Lake and Bayley reservoirs, from the then owners, respondents Williams and Ethel Plasil, who in the meantime through mesne conveyances had succeeded to the former water company's ownership therein. In connection with this latter transaction, the parties thereto entered into an agreement in writing, which agreement is significant in the decision of this case. This agreement, dated January 20, 1942, provided that the sellers, Williams and Plasil, should, for the benefit of 1,280 acres of land owned by them, have the first and prior and preferential right to all the waters of Tule Lake reservoir and all dams, ditches and easements appurtenant thereto. The agreement recited that the waters of the reservoir were primarily impounded and appropriated for furnishing water to said preferred lands and for furnishing water to three other smaller tracts owned by persons not parties to said agreement; that the 1,280 acres should have such preferential rights to the waters of Tule Lake reservoir and the works used in connection therewith and that each of the two ranches making up said total acreage had a right to be supplied with a sufficient quantity of water for the thorough and adequate irrigation of said places without being charged with any costs or expenses for maintenance, operation, improvements or betterments of and to the system; and this was stated to be agreed to because the waters were originally impounded and appropriated for that purpose. Laras agreed to furnish water out of the reservoir and through the irrigation works for such complete and full irrigation of said two ranches each and every year and without imposing any charge or costs for said water services. It was recited that Laras was purchasing a large tract of land, including the said reservoir and irrigation system, and it was agreed that from the system he was so purchasing no water

could be furnished to any lands for irrigation or stock watering purposes which lay south of a road referred to as the Brockman Road and this was stated to be for the reason that the reservoir and system were barely sufficient to furnish adequate waters for the lands north of said road, which lands in the past had been irrigated with waters from said source, it being further stated that the history of water service from said system showed plainly that no additional lands, and particularly lands south of said road, ought to be included as entitled to receive water. As to lands lying north of said road, it was agreed that no lands could be supplied with water, except the lands being sold to Laras by Williams and Plasil, ''save and except that the said Chris Laras shall have water for the purpose of irrigating a tract of land purchased by Chris Laras from Stanford University, approximately one section in area, and a further tract of land comprising approximately 960 acres, which the said Chris Laras is negotiating to purchase through the Sacramento Indian Agency.'' (The proposed purchase from the Indian Agency was not consummated.) It appears that, with the exception of the three small ranches, the parties to this contract among them owned all the lands that for a very long time had received water from the irrigation system and the land for which Laras in this litigation claimed a water right, and that these parties owned the entire water system, together with all water rights to be serviced from the same. This contract, therefore, was one whereby all parties interested in the general subject matter agreed among themselves as to what water service should be rendered from the water supply which is the subject of this action. Laras was then the equitable owner of said section 16, which, at least upon the public records, was shown to have a right of water service from the Madeline system, and he agreed that such right to receive water from the system was to be and was by the agreement subordinated to the overriding rights of the 1,280 acres of land belonging to Williams and Plasil, and to the overriding rights of the three small landowners, to receive water therefrom. At the same time, the parties to said agreement executed a deed of said Madeline system, wherein the system, with all its appurtenances and its appropriative right to water, were conveyed to Laras. It appears that Laras thereafter operated the system, although he did not use any water on said section 16, until during December of 1944, at which time further arrangements were made between him, on the one hand, and Williams and Plasil, on the other. Diffi-

culties and disputes had been encountered and had arisen and Williams and Plasil undertook to repurchase the system from Laras. The result of negotiations between them was that another agreement and accompanying deed were executed. By the agreement Laras agreed to sell to Williams and Plasil all water rights, reservoirs, storage rights, water structures, diversion works, easements and canals, appurtenant to certain described real property and any and all of his interest in and to the waters of Tule Lake reservoir. The agreement was accompanied by a deed made pursuant thereto, which described the real property involved and declared that there was thereby conveyed "all water rights, and waters, reservoirs, and reservoir rights, water structures and diversion works, easements, aqueducts and canals appurtenant to said lands, and any and all of the first party's interests in and to the Madeline or Tule Lake Water System." But this was not all, for the deed also conveyed "all and every right of diversion, allotment and appropriation appertaining to said Tule Lake or Madeline Water System." Thereafter it appears. that Williams and Plasil resumed the operation of the Madeline irrigation system and on June 9, 1945, they entered into a contract with the State of California. This contract recited that Williams and Plasil were selling and transferring to the state approximately 5,000 acres of land situated in Madeline Plains in Lassen County, including the Madeline system, excepting therefrom Bayley reservoir, but permitting the use of that reservoir as a part of the irrigation system. By that agreement they reserved to themselves 3,190 acre feet of water annually from the waters of Tule Lake reservoir for irrigation and stock watering needs on their lands approximating 3,000 acres in extent and on the lands of said three small ranchers whose rights had likewise been protected in the contract with Laras. It was agreed that this 3,190 acre feet of water so reserved to Williams, Plasil and the three small owners should be measured under certain requirements set up in the agreement, that the state should maintain Tule Lake and Bayley reservoirs in a satisfactory manner, make all betterments, improvements, additions and new construction at its own expense and should manage and operate the system, being obligated to deliver such reservoired water as should flow into Bayley reservoir in any year. Hold-back requirements for the purpose of providing water in a future year were provided for and Williams and Plasil agreed that the state could deliver the reservoired water to them and that they would undertake to service the

three small farms and comply with their rights to water. It appears that the purpose of the state in purchasing the system and the right to obtain water therefrom was to carry on a program for the preservation, protection and propagation of migrant water fowl and that from the time the state's contract was entered into between it and Williams and Plasil the parties thereto, including the three small ranch owners and the state, used and consumed all of the waters that had been collected in the reservoirs and so became available for distribution through the irrigation system.

Up to 1946 said section 16 had been uncultivated land covered with sagebrush and other wild growth. During that year Laras commenced to clear the land and in 1948 planted it to grain. However it was not until 1951 that Laras tendered to the parties owning and using the irrigation system the sum of $600 and demanded, pursuant to the terms of the 1912 contract, the delivery of 600 acre feet of water to that land. His request for water was refused and he proceeded to divert water from one of the canals of the system, with the result that Williams and Plasil brought this action to enjoin such diversion. The state intervened, setting up its rights in the premises, and Laras answered and cross-complained. The plaintiffs joined Kenneth Wizner and Albert Herringshaw as defendants with Laras. These men had been tenants of Laras during the year the demand for water service was made and they and Laras cross-complained in the action, Laras setting up his alleged rights to water service for said section 16; Wizner and Herringshaw cross-complained by the assertion of the same rights, with allegations that depending upon those rights of Laras they had planted a grain crop upon the lands in said section 16 which had been lost by reason of the refusal of water service to said lands.

The trial court found that by virtue of the contract and the accompanying deed by which Laras sold the irrigation system to Williams and Plasil he had, as owner of section 16, released and relinquished whatever rights existed for the service of water to said section, whether those rights be considered as arising under the 1912 water rights' contract or under the contract of January, 1942, between himself and Williams and Plasil. The court further found that, as to Williams, Plasil and the State of California, whatever rights existed for the service of water to said section 16 had been extinguished by the adverse user of all of the waters deliverable through said system, or arising by virtue of the appropriate rights

appertaining thereto. The court denied all relief to Laras and to his tenants, and from this judgment all three have appealed. The State of California has filed a cross-appeal, contending that under its contractual arrangements with Williams and Plasil any water that had to be supplied to said section 16, if Laras finally prevailed, would have to be furnished by Williams and Plasil out of their reserved 3,190 acre feet of water and that the court should have made findings which would have protected the state in that regard.

There is much discussion in the briefs concerning appropriative water rights, the nature thereof, the various relationships which arise in respect thereto, and concerning other matters akin to that general subject. We think it unnecessary to follow the parties in their contentions resting upon such matters. We hold that the decision of the trial court, insofar as it rests upon that court's construction of the contractual relations between the parties hereto, was and is correct and supports the judgment rendered. We have already taken pains to recite with sufficient particularity the pertinent provisions of the contractual undertakings as shown in the executed instruments and it is unnecessary to repeat them. ■ Suffice it to say that, so far as the parties to this action are concerned, the contract of January, 1942, and the accompanying deed between Laras, then the owner of said section 16, and Williams and Plasil, then the owners of all the other lands involved in this action and of the irrigation system, determined the rights of the parties and of their lands to service of water from the Madeline system. Whatever the preceding rights were, it was there agreed that the lands of Williams and Plasil should have, as against section 16 and the lands then being conveyed to Laras, preference and priority in the use of the waters from the system to the full extent to which those lands needed water for irrigation and stock watering purposes. It was further then settled that as between Laras on the one hand and Williams and Plasil on the other, Laras, with respect to water used upon said section 16 and other lands then being conveyed to him, was to be subrogated to the three small ranch owners mentioned in the documents, and it was further settled that, after these demands had been met, Laras could use irrigation waters from the system upon said section 16 and other lands then being conveyed to him and that his rights to water were thus limited. We hold, therefore, that Laras was in this action estopped by contract and deed to demand or enforce a right

to any use of water from the Madeline system otherwise than as so fixed.

These limited rights, however, to water service on section 16 Laras did have after the execution of the contract and deed of January, 1942.

We now proceed to consider the trial court's conclusions as to the effect of the contract and deed of December, 1944, whereby and whereunder Laras, on the one hand, and Williams and Plasil on the other, again negotiated and contracted concerning the same general subject matter dealt with by them in January of 1942. Once again, so far as any rights litigated in this action be concerned, we have dealing with each other parties competent to contract for and to fix the rights to the use of water from the Madeline system. We see Laras conveying back to Williams and Plasil all of the lands, water rights, canal, ditches, etc., making up the Madeline system, and both the contract and the deed between the parties contained language suitable, and as the trial court found, intended by the parties, to effectuate a complete release and relinquishment by Laras of any right to receive for use on section 16 any water from said system. Said the contract: "The said deed shall also convey all water rights of Seller [Laras], reservoirs, storage rights, water structures, diversion works, easements and canals appurtenant to said lands, and *any and all of Seller's interest in and to the waters of said Tule Lake Reservoir.*" (Italics ours.) Said the deed, after describing the land conveyed: "Also all water rights, and waters, reservoirs, and reservoir rights, water structures and diversion works, easements, aqueducts and canals appurtenant to said lands, and any and all of the first party's interests in and to the Madeline or Tule Lake Water System, *together with all and every right of diversion, allotment and appropriation appertaining to said Tule Lake or Madeline Water System.*" (Italics ours.) It is to be noted that the contract and deed did not specifically describe the water rights and rights of diversion, etc., agreed to be conveyed, and conveyed, by Laras to Williams and Plasil, but used general and all-inclusive language to describe the same. Since Laras contended in the trial court that his rights as owner of section 16 to receive water from the system for use on that land was not included within the general language of the contract and deed, it was proper for the trial court to take testimony concerning the negotiations of the parties leading up to the execution of those documents. This the trial court did and

Williams, who conducted the negotiations for himself and Plasil, testified to a conversation with Laras at a meeting attended by the interested parties and their respective counsel, in which he announced to Laras that he was buying back the Madeline system and the lands particularly described in the contract and deed because of the trouble he had been having with Laras concerning his operation of the system and his service of water therefrom to the lands of Williams, Plasil and the three small landowners. It was testified that Williams stated to Laras: "I want this transaction to take care of everything, all the rights of any that you claim in the Tule Lake reservoir, and its ditches. . . . During the past two years, you were supposed to have maintained those ditches and those waters under the agreement that I had with you; that you failed to do it. The only reason I had any water at my place was because I went to the headgates and repaired the outlet. . . . I want you out of the picture entirely, I don't want to have anymore trouble with you, we have trouble with this litigation, I have been involved and I want to be out of the picture. I have got to take care of Mr. Ponty and Mr. Bollenbacher. Chris, I want to get you out of this picture; you and I haven't gotten along and I want to take you out entirely. I can't depend on your taking care of the water, and you are making some arrangements of buying some of these other lands, the Stanford property and the Indian lands, and I want to know that you haven't any claim or right and when I pay you this money that you have nothing further whatever to do with these properties." ▉ There was testimony that a witness had a conversation with Laras, in which he stated to Laras: "I note that you have cleared the ground here on the Stanford property, you are doing a pretty good job of it. What are you going to do with the land after you haven't any water to go on it? You gave up your rights in that matter to Mr. Williams." To this Laras replied: "Yes, I know, but I can drill a water well. This canal has been running by on the upper side of this property for years and I know there is water down here, and I can drill a well and develop my water that way." There was other testimony supportive of the trial court's construction of the contract and the deed, but enough has been said to show that these parties intended by the contract and deed to finally and forever foreclose any claim that there existed any right for the benefit of said section 16 to receive any water from the Madeline irrigation system.

As we have stated, the trial court further found that Laras had lost through the adverse use of all the water of the system by the respondents and their predecessors in interest any right to demand and receive water for use on said section 16. We think it unnecessary to discuss the contentions of the parties pro and con upon this subject since we have held that Laras, while owner of said section 16, disposed of the right he here claims.

For the same reason we think it unnecessary to discuss the state's contentions that it was entitled to certain findings as to who has the burden of furnishing water to section 16 if eventually it should be determined in this case that such right existed. As we view it, the contingency will not arise.

The judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.